**Affirmed as Modified and Opinion Filed November 6, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01038-CR

**RACHARD RAMON ANGTON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F-1355911-H**

## MEMORANDUM OPINION

Before Justices Francis, Lang, and Brown
Opinion by Justice Francis

A jury convicted Rachard Ramon Angton of murder and assessed punishment, enhanced by two prior felony convictions, at forty years in prison. In two issues, appellant complains the jury charge did not include instructions on the presumption of reasonableness and lack of a duty to retreat, both of which relate to self-defense. For reasons set out below, we conclude both issues are without merit. On our own motion, we modify the trial court's judgment to make it conform to the record and affirm the judgment as modified.

Joseph Taylor Jr. was a mechanic and had a shop on a large lot on Westmoreland Drive in west Dallas. Although appellant and Taylor were not related, appellant referred to Taylor as "Uncle." It is undisputed that appellant shot and killed Taylor, but appellant claimed at trial he

was acting in self-defense. Because appellant was the only person with Taylor when he was killed, we begin with appellant's testimony.

Appellant testified he made a deal to buy Taylor's Crown Victoria. Appellant and a friend, Michelle Horne, were going to share the car, and Horne exchanged her Smith and Wesson 9 mm gun for rims to put on the Crown Victoria. Appellant made a down payment of $500 on the car, but Taylor would not let him take possession until he paid the full $1000.

By the next day, appellant had purchased a different car, a blue Caprice, and went to Taylor's shop to get his money back. When he arrived, Taylor's friend, Maurice Henderson, was there, and appellant waited until Henderson left to ask for the refund. Appellant said Taylor refused to return his money but offered to return Horne's gun. Appellant said he did not want the gun, and he and Taylor got into a "heated" argument. Appellant testified that Taylor "swung" at him, and the two began fighting.

The fight led to an area near Taylor's pit bull, which other witnesses said was kept tied up at the front of the shop. Appellant said he was afraid of the dog and while he was distracted by it, Taylor suddenly shot him in the leg. Appellant said Taylor previously placed Horne's 9 mm gun on a trailer located in the middle of the lot. Appellant ran across the lot and grabbed the gun, ducked, and shot back. He said he did not try to "get out of there" because Taylor was shooting at him. When the gunfire stopped, he could not see Taylor but could hear him saying to "go on and leave, get out of here."

Appellant ran for his car, which was parked in the front of the shop, and left. He threw the gun off the Westmoreland Bridge and did not call 911 because he was "scared" and "wasn't thinking straight." Although at least three hospitals were in the area, he drove seventeen miles to a Carrollton hospital to seek treatment for his wound. He gave hospital employees a fake name, Jonathan Jackson. When the hospital employees began questioning him about what happened, he

did not want to "tell it on my uncle" so he tried to leave with an IV in his arm. By that time, Horne had arrived at the hospital and given employees appellant's real name. Horne removed appellant's IV, and the two went to a Plano hospital for treatment. Appellant was arrested at that hospital.

Appellant testified he shot Taylor because he had "no other choice." He testified he did not go to the shop with the idea of killing his uncle and he did not intentionally try to kill him. He said he was defending himself. Although he had shot at Taylor six times, he said he did not think anything was wrong with his uncle when he left the shop.

The State's evidence contradicted appellant's story of what occurred. Taylor's friend Henderson lived directly behind the shop. He testified he was at the shop that day, and appellant was also there. Henderson left long enough to walk home and get a drink. About seven or eight minutes later, he walked outside to return to the shop and heard "arguing or loud talking." He walked to the back yard to see if he could hear better and heard three to five "big shots" and then, about five seconds later, two "small shots." Henderson said he could tell the shots came from two different guns. He immediately called Taylor, who he said was either "mumbling" or "moaning." As he ran to the shop, he saw a blue Caprice leaving the area. He found Taylor lying on the ground in front of a trailer and called 911. Taylor's pit bull was tied up.

As officers arrived, they gained entry to the property by a back road because the gate to the front entrance was closed and locked. Taylor was lying on the ground face up near a trailer covered in a blue tarp. His body was in a "contorted" position, and about eight to ten men were standing around talking to him. The first officer at the scene noticed a gun near Taylor and collected the weapon, a .32-caliber Smith and Wesson. The officer checked the gun, and it was loaded with a magazine with six bullets.

Sr. Cpl. John H. Lumbley of the Dallas Police Department talked to Taylor at the scene, and Taylor told him in a "very deliberate" manner that appellant shot him and also described appellant's clothing. Taylor was in "obvious pain" so Lumbley did not question him about how the shooting occurred. Taylor was transported to the hospital, where he went into cardiac arrest within minutes and died.

At the scene, officers saw fired casings, bullet fragments, and holes in vehicles. Photographs were taken showing the locations of the fired casings and bullet fragments as well as the bullet hole in the hood of one truck; these photographs were admitted into evidence.

Photographs depicting different areas of the shop lot were also admitted. In the front of the lot near the entrance was a two-bay garage structure; outside the garage doors was an igloo-style doghouse where Taylor's pit bull was kept. No casings or bullet fragments were found in this area.

In the area where Taylor was found (which a witness said was the middle of the lot) was an old eighteen-wheeler cargo-type structure used for storage. In front of the structure was a trailer covered by a tarp. Two railroad ties were on the ground nearby. In this area, police recovered one fired .32-caliber casing as well as the loaded .32-caliber weapon.

Finally, outside the area of the cargo structure, trailer, and railroad ties were several older vehicles. Six fired 9 mm casings were found in this area; these casings were determined to come from the gun that Horne traded Taylor for rims.[1] The firearms examiner who made the determination also testified that each gun leaves its own unique markings on bullets or casings. She also testified a 9 mm gun is larger than a .32-caliber gun. Because the 9 mm is a larger

---

[1] The evidence showed that a year before this shooting, the Dallas Police Department had possession of a Smith and Wesson 9 mm handgun, did test firings on the handgun, and entered those records in NIBIN, a national ballistics database. That handgun was later released to Horne. Police submitted the 9 mm casings found at this crime scene to NIBIN and matched them to test firings from the gun released to Horne.

cartridge, she said it holds more gunpowder and "will probably be a bit louder" than a .32-caliber automatic.

Dr. Chester Gwin, a medical examiner, performed Taylor's autopsy. He said Taylor's body had three different gunshot wounds and other injuries that could have been caused by a fall or a fight. With respect to the gunshot wounds, Gwin said two were "through and through" wounds, meaning there was an entrance and an exit. One bullet went through Taylor's left outer arm, moved from back to front and upward, and exited his inner arm. Another bullet entered the outside of his left knee, moved from left to right, slightly back to front, and exited the anterior front aspect of the knee. The third bullet lodged in his right thigh. It entered the side of his left hip/flank area, went through his abdomen, hit the iliac vein and his bladder, and fractured his right femur. This shot went from left to right and several inches downward. Gwin determined the cause of death was gunshot wounds and the manner of death was homicide.

In addition to the above, other evidence revealed appellant told workers at the Carrollton and Plano hospitals different stories of how he was injured. At Carrollton, he first said he was shot during a robbery and then said he was shot walking down the street. At Plano, he said a gun in his pocket discharged, firing a bullet into his thigh.

The trial court instructed the jury on the law of self-defense, including the use of deadly force. *See* TEX. PENAL CODE ANN. §§ 9.31, 9.32(a) (West 2011). Based on that law, the trial court instructed the jury that a person is justified in using deadly force when the actor reasonably believed that the force was immediately necessary to protect himself against another person's use or attempted use of unlawful deadly force. *See id*. § 9.32(a)(2)(A). The trial court, however, did not instruct the jury under section 9.32(b), which creates a presumption that the actor's belief that deadly force was immediately necessary was reasonable if certain criteria are met. *See* TEX. PENAL CODE ANN. § 9.32(b). Nor did the charge contain an instruction under section 9.32(c),

–5–

which provides that a defendant does not have a duty to retreat before using deadly force if certain criteria are met. *See* TEX. PENAL CODE ANN. § 9.32(c). Appellant did not request or object to the absence of these instructions. The jury ultimately rejected appellant's self-defense claim and found him guilty of murder. This appeal followed.

In two issues, appellant complains he was egregiously harmed by the trial court's failure to instruct the jury on the presumption of reasonableness and lack of duty to retreat. We begin with the presumption of reasonableness.

The statutory presumption favoring a defendant must be submitted to the jury "if there is sufficient evidence of the facts giving rise to the presumption . . . unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact." *Id*. § 2.05(b)(1) (West 2011); *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). As relevant here, the presumption of reasonableness applies unless the State proved beyond a reasonable doubt at least one of the following: (1) appellant neither knew or had reason to believe that Taylor was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery, (2) appellant provoked Taylor; or (3) at the time deadly force was used, appellant was engaged in criminal activity other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic. *See id*. § 9.32(b)(1)(C), (2), (3); *Villarreal v. State*, 453 S.W.3d 429, 435 (Tex. Crim. App. 2015).

For purposes of our opinion, we will assume the trial court erred in failing to give the instruction and turn to whether such error requires reversal based on the test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). Under *Almanza*, the degree of harm required for reversal depends on whether the error was preserved in the trial court. *Villarreal*, 453 S.W.3d at 433. When the defendant fails to object, as is the case here, reversal is

required only if the error was so egregious and created such harm that the defendant was deprived of a fair and impartial trial. *Id*.

Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Id*. Egregious harm is a "high and difficult standard" to meet, and such a determination must be "borne out by the record." *Id*. On appeal, neither party bears the burden of showing harm or a lack thereof under this standard. *Id*. But, we will not reverse a conviction unless a defendant has suffered actual rather than theoretical harm. *Id*. To determine whether charge error has resulted in egregious harm to a defendant, we consider (1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole. *Id*.

The charge begins with an abstract instruction on the elements of murder and relevant definitions followed by instructions on the law of self-defense. The self-defense charge correctly informed the jury on the general law of self-defense, including when the use of force and deadly force is justified under the statute, the meaning of "reasonable belief", and that force is not justified in response to verbal provocation alone. Thereafter, an application paragraph instructed jurors that even if they believed from the evidence beyond a reasonable doubt that appellant caused Taylor's death, if they further believed or had

> a reasonable doubt thereof, that at the time he did so, the defendant reasonably believed Joseph Taylor was using or attempting to use unlawful deadly force against him and that he reasonably believed that the use of force and the degree of force used were immediately necessary to protect himself against Joseph Taylor's use or attempted use of unlawful deadly force, you will find the defendant not guilty.

Thus, the charge generally instructed the jury on the law of self-defense under section 9.31 and included an instruction on the law that applies to a defendant's use of deadly force under section 9.32(a). The charge did not instruct the jury, however, on the presumption of

reasonableness regarding appellant's purported belief that the use of deadly force was immediately necessary. But if the omitted instruction had been given, it would have allowed the jury to disregard the presumption if it concluded that appellant (1) had no reason to believe Taylor was trying to murder him, (2) appellant provoked Taylor, or (3) appellant, at the time of the shooting, was otherwise engaged in criminal activity as defined in the statute. *See* TEX. PENAL CODE ANN. § 9.32(b). Thus, a complete instruction would have permitted the jury to decide that the presumption did not apply to the facts of appellant's case if certain circumstances existed. Because the applicability of the presumption was dependent on the evidence, we turn to the second factor, the state of the evidence.

In considering this factor, we keep in mind that it is appropriate to consider the plausibility of the evidence raising self-defense. *Villarreal*, 453 S.W.3d at 436. Here, appellant's story was that Taylor swung at him after he asked for refund; they got into a physical fight; the fight moved them near Taylor's pit bull; and while he was distracted by the dog, Taylor shot him in the leg. Appellant said he ran across the lot, grabbed the 9 mm gun that Taylor had put on a trailer, ducked, and began to shoot. But Henderson, who lived directly behind the shop, testified he heard arguing and then heard three to five "big shots" followed by two "small shots." Henderson said he could tell the shots came from two different guns. The firearms examiner testified that a 9 mm cartridge is larger and holds more gunpowder, so it louder when fired than a .32-caliber gun.

Additionally, the physical evidence contradicts appellant's version of what occurred. Detective Tabor explained that in an automatic weapon, the casing is automatically ejected when the gun is fired. No casings were found in the front of the shop where the dog was tied up. Six 9 mm casings were found in various locations near some of the older cars parked on the lot, but no 9 mm casings were found in the area of the tarp-covered trailer where appellant claimed to have

shot back at Taylor. The only casing found near the trailer was the .32-caliber casing, which came from the gun presumably used by Taylor. And this was the only .32-caliber casing found at the scene. So, the physical evidence showed (1) Taylor was not where appellant claimed he was when Taylor shot him, because there were no casings near the area where the dog was tied up and (2) appellant was not where he claimed to be when he shot back at Taylor because the 9 mm casings were not in that area. This evidence undermined appellant's entire sequence of events.

Finally, the medical examiner testified Taylor sustained three gunshot wounds. One gunshot entered through Taylor's left arm, slightly back to front, from left to right, and upward; another went into the side of Taylor's left hip/flank area, left to right and downward; and the third went through his left knee, from left to right and slightly back to front. In short, because two of the gunshots were from back to front, and all entered on the left side of Taylor's body, the evidence suggests Taylor was facing away from appellant when he was shot.

Other than appellant's testimony about what happened at the shop lot and the fact he was shot in the leg, no other evidence supports his story. Rather, appellant's version of what happened that day was contradicted by all of the physical evidence as well as Henderson's testimony about what he heard. Given the weakness of appellant's defensive evidence when compared to the other evidence in the record refuting his story, we cannot conclude there is a substantial risk that appellant was harmed by the omission of the presumption or that the instruction would likely have altered the outcome as to whether appellant acted in self-defense. Accordingly, this factor weighs against a conclusion that appellant suffered some actual rather than theoretical harm.

Next, we consider closing arguments where the primary focus of both sides was whether appellant acted in self-defense at all, not whether his actions were reasonable given his version of

events. Appellant's counsel went through appellant's testimony and noted the only people present at the time of the shooting were appellant and Taylor. He argued the situation "got out of hand there real fast" but that appellant did not go to the shop with intent to kill Taylor. The State argued the physical evidence "doesn't lie" and went through that evidence in detail as well as appellant's conduct after leaving the scene, including getting rid of the gun, driving seventeen miles to one hospital, leaving to go to another hospital, giving a false name at both hospitals, and giving false stories about how he was injured. Calling his story "preposterous," the State urged that appellant did not act in self-defense but instead murdered Taylor. Given the focus of the arguments, we cannot conclude this factor suggests actual, rather than theoretical, harm from the failure to include the presumption instruction in the jury charge.

The final *Almanza* factor addresses any other relevant information revealed by the record as a whole. We have reviewed the record and are not aware of any other relevant information that requires our consideration.

On this record and considering the *Almanza* factors, we conclude any error in failing to instruct the jury on the presumption of reasonableness caused no actual, as opposed to theoretical, harm to appellant. We resolve his first issue against him.

In his second issue, appellant complains the trial court failed to instruct the jury on the lack of a duty to retreat. Under section 9.32(c), a person who has a right to be present at the location where the deadly force is used, has not provoked the person, and is not engaged in criminal activity at the time deadly force is used is not required to retreat before using deadly force. *Id.* § 9.32(c).

As before, we will presume the trial court erred in failing instruct the jury on this lack of a duty to retreat and review the record for egregious harm. For the same reasons set out previously in our analysis of the charge and state of the evidence, we conclude appellant was not

egregiously harmed by the lack of an instruction. In addition, we note that neither party mentioned retreat in closing arguments, so it is unlikely the jury would have considered such a duty when deciding the case. We resolve appellant's second issue against him.

Finally, although neither party has raised the issue, our review of the record reveals errors in the trial court's judgment. First, the judgment shows appellant's first name as "Richard." Appellant testified at trial and identified himself as "Rachard Ramon Angton." Additionally, the indictment and both charges (guilt-innocence and punishment) identify him as "Rachard."

Second, at the beginning of the punishment phase, appellant pleaded true to two enhancement paragraphs alleging prior felony convictions, and the jury was instructed to find those allegations true. The judgment, however, shows "N/A" to pleas and findings on enhancement paragraphs.

This Court has the authority to correct a judgment of the court below to make the record "speak the truth" when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). This authority is not dependent upon a request by a party nor does it turn on the question of whether a party has objected in the trial court. *Id*. at 529–30. Accordingly, we modify the judgment to reflect (1) appellant's first name as "Rachard" and (2) pleas and findings of true to both the first and second enhancement paragraphs.

We affirm the trial court's judgment as modified.

Do Not Publish
TEX. R. APP. P. 47.2(b)
141038F.U05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

RACHARD RAMON ANGTON, Appellant

No. 05-14-01038-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 1, Dallas County, Texas
Trial Court Cause No. F-1355911-H.
Opinion delivered by Justice Francis;
Justices Lang and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect: (1) Appellant's first name as Rachard and (2) Pleas of True and Findings of True to the First and Second Enhancement Paragraphs.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 6th day of November, 2015.